IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CATHY LYNN RODRIGUEZ                                                              PLAINTIFF

v.                                          CIVIL NO. 16-2039

CAROLYN W. COLVIN, Commissioner
Social Security Administration                                                    DEFENDANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Cathy Lynn Rodriguez, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

**I.     Procedural Background:**

Plaintiff protectively filed her current application for DIB on February 13, 2013, alleging an inability to work since January 1, 2011,[1] due to depression, severe stress [urinary] incontinence, and cervical erosion. (Doc. 7, pp. 58, 152). For DIB purposes, Plaintiff maintained insured status through June 30, 2013. (Doc. 7, pp. 14, 159). An administrative hearing was held on July 1, 2014, at which Plaintiff appeared with counsel and testified. (Doc. 7, pp. 29-56).

---

[1] The Court notes that Plaintiff's Pre-Hearing Memorandum states that the alleged onset date is February 2, 2012. (Doc. 7, p. 261).

1

By written decision dated November 7, 2014, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Doc. 7, p. 16).  Specifically, the ALJ found that through the date last insured, Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, chronic obstructive pulmonary disease (COPD), and a cervical mesh problem. However, after reviewing all of the evidence presented, the ALJ determined that through the date last insured, Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Doc. 7, p. 16). The ALJ found that through the date last insured, Plaintiff retained the residual functional capacity (RFC) to:

> performسدentary work as defined in 20 CFR 404.1567(a) except she was limited to occasional climbing, balancing, handling/fingering bilaterally, operating foot controls bilaterally, and exposure to hazardous machinery, unprotected heights, temperature extremes, dusts, odors, fumes, gases, and poorly ventilated areas.  She was further limited to no stooping, kneeling, crouching, or crawling.

(Doc. 7, p. 17). With the help of a vocational expert, the ALJ determined that through the date last insured, Plaintiff could perform her past relevant work as a bookkeeper.  (Doc. 7, p. 21). The ALJ further found that Plaintiff was able to perform work as a travel clerk prior to the expiration of her insured status.  (Doc. 7, p. 22).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on February 16, 2016.  (Doc. 7, p. 5-8).  Subsequently, Plaintiff filed this action.  (Doc. 1).  Both parties have filed appeal briefs, and the case is now before the undersigned for report and recommendation.  (Docs. 8,9).

The Court has reviewed the entire transcript.  The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.     **Evidence Presented:**

At the time of the administrative hearing on July 1, 2014, Plaintiff testified that her real estate license was current because she continued to manage a couple of rental properties. (Doc. 7, p. 35). Plaintiff testified that she had managed these two properties for a while and basically just collected a check. (Doc. 7, p. 37).

In March of 2009, prior to Plaintiff's alleged onset date, Plaintiff underwent a mid urethral transobturator sling procedure to treat her stress urinary incontinence. (Doc. 7, pp. 461-523). Plaintiff's complaints during the relevant time period appear to stem from later complications due to this procedure.

The medical evidence for the relevant time period reflects the following. On March 22, 2011, Plaintiff complained of bilateral heel pain, right greater than left, and a rash for two weeks. (Doc. 7, pp. 334-335). Dr. H. Macon Landers noted Plaintiff's heels were tender as was her plantar fascia.

On September 13, 2011, Plaintiff complained of pain from her right elbow into her forearm, right hand weakness, and hot flashes. (Doc. 7, pp. 332-333). Plaintiff reported that Ibuprofen helped with her right arm pain. Dr. Landers recommended that Plaintiff stop smoking. With the exception of a tender right lower triceps and right plantar fascia, Plaintiff's examination was within normal limits.

On November 17, 2011, Plaintiff reported that her foot was about the same, that her right elbow hurt, that she was still smoking, and that she still had pain associated with the mesh on her bladder wall. (Doc. 7, pp. 330-331, 347). Dr. Landers diagnosed Plaintiff with tendonitis of the right triceps, early COPD, right foot fasciitis, and bladder mesh perforation.

An x-ray of Plaintiff's right elbow revealed minor arthritic changes but no acute bony abnormality.

On April 10, 2012, Plaintiff complained of "mesh in my vagina" and pain. (Doc. 7, pp. 308-309, 367-368). Plaintiff reported that she was unable to function sexually. Dr. Roger R. Dmochowski noted Plaintiff had been advised to try topical estrogens, but had no other intervention. Plaintiff reported she used Ibuprofen as needed. Plaintiff reported smoking one package of cigarettes a day. Plaintiff indicated that she wanted to have the mesh excised. Upon examination, Dr. Dmochowski noted Plaintiff had no abdominal tenderness, flank pain, or point tenderness. Plaintiff had marked tenderness over the exposed sling at the bladder neck. Plaintiff underwent a cystoscopy that demonstrated no grossly exposed mesh in the vagina. Dr. Dmochowski's impression was vaginal mess exposure associated with significant dyspareunia. It was recommended that Plaintiff have the mess excised. Plaintiff underwent an urethrolysis and mesh excision without complication on April 23, 2012. (Doc. 7, pp. 307, 310, 364-367, 369-371).

On May 5, 2012, Plaintiff was seen by Dr. Rochell L. Sasse for a follow up from her urethrolysis and mesh excision. (Doc. 7, pp. 363-364). Plaintiff reported she had "done well." Plaintiff was concerned about the continued pain, however, she reported she was feeling "some better." Plaintiff denied a limitation of movement or weakness in her extremities. Plaintiff denied experiencing depression or anxiety. Upon examination, Plaintiff's abdomen was noted as nontender, and there was no flank or CVA tenderness. Plaintiff was encouraged to use a sitz bath, and was given permission to start mopping and vacuuming in one month. Plaintiff was to return in eight weeks.

In an email to Dr. Sasse dated June 19, 2012, Plaintiff reported that she had two trials of sex and experienced pain on contact. (Doc. 7, p. 440-441). Plaintiff reported that she still had discomfort with walking, and had experienced some bladder spasms but no leakage. Plaintiff asked if she could try physical therapy and vaginal valium. Plaintiff also reported she was somewhat depressed. Dr. Sasse prescribed both the valium and physical therapy.

On July 3, 2012, Plaintiff was seen by Dr. Sasse, for a follow up from her urethrolysis and mesh excision. (Doc. 7, p. 361-362). Plaintiff reported she had "done well." Plaintiff was concerned about continued pain, but noted she was feeling "some better." Plaintiff reported that she continued to use her valium nightly in suppository form, and was attending pelvic floor physical therapy. Upon examination, Plaintiff's abdomen was noted as nontender, and there was no flank or CVA tenderness. Plaintiff was given permission for intercourse, and to start mopping, vacuuming and lifting. Plaintiff was to continue with her pelvic floor physical therapy.

In an email to Dr. Sasse dated August 3, 2012, Plaintiff reported she had her first trigger point injection into her left pubic ramus performed by Dr. Frank Ling. (Doc. 7, pp. 285, 445). Plaintiff reported that the injection was painful. Plaintiff reported that Dr. Ling prescribed nortriptyline because he thought she might have abnormal nerve endings. Plaintiff reported that she was seriously considering applying for disability because she was unable to do most of her job. Plaintiff indicated that she also needed to eliminate as many distractions in her life so that she could focus on her recovery and her family. Plaintiff thought she would also hire someone to help with things around the house.

On August 27, 2012, upon the referral of Dr. Landers, Plaintiff was seen at Southwest Neurological Institute by Dr. William L. Griggs. (Doc. 7, pp. 287-288, 290-293). Plaintiff

reported vaginal pain since April of 2012. Plaintiff reported that in February of 2012, she started having pain in her vagina when having intercourse. Dr. Griggs noted that Plaintiff had a bladder suspension in the past and it was thought this was the problem. Plaintiff reported that the bladder suspension was taken down last April, and it was after that surgery that she had even more pain. Plaintiff reported that she was doing some vaginal exercises on June 27, 2012, that aggravated the pain and lasted for several days. Plaintiff started trigger point injections on July 30, 2012, which did not help the pain. Plaintiff reported taking Diazepam and Nortriptyline. Dr. Griggs noted Plaintiff was a realtor with a college education. Plaintiff reported smoking one package of cigarettes a day. Upon examination, Dr. Griggs noted Plaintiff was alert, oriented, cooperative and mentally clear. Plaintiff's motor exam was normal for power, bulk, development, and tonus. Plaintiff was able to walk on heels and toes, to tandem walk, and to hop on either foot. Dr. Griggs noted Plaintiff was a little unsteady on tandem walking and wanted to hold onto the wall. Plaintiff was diagnosed with vaginal pain following a bladder suspension removal or undoing of a bladder suspension. Plaintiff underwent nerve conduction studies of the lower extremities that revealed a normal result, with no evidence of neuropathy. Plaintiff's EMG study was normal, and revealed no evidence of radiculopathy or myopathy. A MRI of Plaintiff's lumbar spine revealed a small, far left lateral disc protrusion L5-S1 slightly abutting the exiting L5 nerve roots; a left lateral bulge or tiny protrusion L4 with no significant nerve root compression; and no large disc herniation or canal stenosis.

On September 12, 2012, Plaintiff was seen at Sparks Neurosurgical Associates for a consult. (Doc. 7, pp. 279-280). Dr. Shawn P. Moore noted Plaintiff was in for an evaluation of her left groin/pelvic pain.

Plaintiff underwent outpatient rehabilitation from June 27, 2012, through September 19, 2012. (Doc. 7, pp. 271-275). On September 19, 2012, Plaintiff reported that she had had four good weeks. Plaintiff was able to decrease the dosage of her nortriptyline, and to have intercourse with only mild discomfort. Plaintiff was noted as walking normally now, but had not challenged herself with steps. Plaintiff reported that she was able to ride a bike for a few minutes without any problems. Upon examination, Plaintiff's pelvic alignment was noted as good. Plaintiff was found to have met her long term goals of decreased pain by ninety percent, increased range of motion, and intercourse without pain medication. Plaintiff was discharged from rehabilitation.

On November 26, 2012, Plaintiff underwent a colonoscopy that revealed internal hemorrhoids but was otherwise normal. (Doc. 7, p. 318).

On January 30, 2013, Dr. Landers noted Plaintiff was last seen on November 12, 2011. (Doc. 7, pp. 328-329, 338-342). Plaintiff was in for a yearly exam, but also requested a referral to UCLA. Plaintiff reported that her bladder was better. Dr. Landers noted that not all of the mesh had been removed, and that Plaintiff planned to go to UCLA for the removal. Plaintiff reported she still ached some on her left side, stating "I can't break dance." Plaintiff denied depression. Upon examination, Dr. Landers noted that Plaintiff's abdomen was nontender, her range of motion was intact, and Plaintiff had no deficits in motor strength or gait/station. Dr. Landers noted Plaintiff did not have a long stride.

On February 11, 2013, Plaintiff underwent a CT Scan of the abdomen and pelvis that revealed the following: a probable small cyst in the right lobe of the liver, just lateral to the vena cava in the upper part to mid-part of the right lobe of the liver; and a mild prominence to the mucosa of the fundus and proximal body of the stomach which was probably a function of

underdistention. (Doc. 7, p. 311-314). An addendum completed by Dr. Richard Norman Brown reported that the mesh was not radiographically dense enough to be visible on the CT.

On April 24, 2013, Plaintiff was seen by Dr. Shlomo Raz, at UCLA Health. (Doc. 7, pp. 299-303). Dr. Raz noted Plaintiff underwent an Obtryx transobturator sling in 2009 for stress incontinence. Plaintiff reported the sling resolved the incontinence; however, she never felt the same after the placement of the sling. Plaintiff reported that three to four months after the surgery she began to have pain with leg raising. Plaintiff reported an acute episode of pain in February of 2012, in the left vaginal groin area during intercourse and had experienced nearly chronic pain since that time. On April 23, 2012, Plaintiff underwent a mesh removal. Plaintiff reported that following this surgery, she underwent physical therapy and some trigger point injections and had experienced some improvement with pain with walking. However, Plaintiff reported that she still did not feel like her normal self and suffered significant vaginal groin pain and had been unable to participate in intercourse. Dr. Raz noted that Plaintiff reported that she was a real estate agent but had to drastically reduce her workload due to the pain. Plaintiff reported that she smoked one package of cigarettes a day and had done so for the past 35 years. Dr. Raz recommended an adductor exploration and complete mesh removal.

On May 10, 2013, Plaintiff was seen by Dr. Landers to discuss her problems. (Doc. 7, pp. 326-327). Plaintiff reported that she went to California, and the doctor there thought she needed to have all of the sling removed. Plaintiff reported her surgery was scheduled for September 25, 2013. Upon examination, Dr. Landers noted that Plaintiff's abdomen was nontender, her range of motion was intact, and Plaintiff had no deficits in motor strength or gait/station. Plaintiff reported that Lorcet helped with her pain.

8

In an email to Dr. Sasse dated June 13, 2013, Plaintiff reported that she continued to have pain in her left groin. (Doc. 7, pp. 304, 447). Plaintiff reported that it hurt to walk and that she had not had sex since January due to pain. Plaintiff asked Dr. Sasse to clarify if there was still mesh in the pelvis. Dr. Sasse indicated that there was still mesh in the pelvis and that premarin cream was a good idea.

### III.     Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from

9

anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(C). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 404.1520.

**IV.    Discussion:**

Plaintiff argues the following issues on appeal: 1) the ALJ failed to consider all of Plaintiff's impairments in combination; 2) the ALJ erred in the analysis and credibility findings in regard to Plaintiff's subjective complaints of pain; 3) the ALJ erred in disregarding the opinions and findings of the primary treating physician, Dr. Landers; 4) the ALJ erred in finding Plaintiff retained the RFC to perform a limited range of sedentary work; and 5) the ALJ erred in finding Plaintiff retained the RFC to perform her past relevant work

**A.    Insured Status:**

In order to have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability. 42 U.S.C. § 416(i)(3)(B). Plaintiff last met this requirement on June 30, 2013. Regarding

10

Plaintiff's application for DIB, the overreaching issue in this case is the question of whether Plaintiff was disabled during the relevant time period of January 1, 2011, her alleged onset date of disability, through June 30, 2013, the last date she was in insured status under Title II of the Act.

In order for Plaintiff to qualify for DIB she must prove that, on or before the expiration of her insured status she was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984). Records and medical opinions from outside the insured period can only be used in "helping to elucidate a medical condition during the time for which benefits might be rewarded." Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that the parties must focus their attention on claimant's condition at the time she last met insured status requirements).

### B.     Combination of Impairments:

Plaintiff argues that the ALJ erred in failing to consider all of the claimant's impairments in combination.

The ALJ stated that in determining Plaintiff's RFC prior to the expiration of her insured status, he considered "all of the claimant's impairments, including impairments that are not severe."  (Doc. 7, p. 15).  The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments through the date last insured.  (Doc. 7, pp. 16-17).  Such language demonstrates the ALJ considered the combined effect of Plaintiff's impairments. Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994).

### C. Subjective Complaints and Credibility Analysis:

We now address the ALJ's assessment of Plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. At the administrative hearing held on July 1, 2014, after her insured status expired, Plaintiff testified that her real estate license was current as she continued to manage two properties. (Doc. 7, p. 35). Plaintiff explained that she was basically enjoying "the fruit of [her] labor previously," and that she basically collected the rent check. (Doc. 7, pp. 35-36). Plaintiff testified that she would soon be losing one of the properties because she could not show it to future renters. A review of the record revealed that Plaintiff completed a Function Report on May 13, 2013, wherein she indicated that she was able to take care of her personal needs, noting some issues with putting on socks; to prepare simple meals; to do light housework with breaks; to drive short distances; and to shop in stores. (Doc. 7, pp. 223-233). This level of activity belies

12

Plaintiff's complaints of pain and limitation and the Eighth Circuit has consistently held that the ability to perform such activities contradicts a plaintiff's subjective allegations of disabling pain. See Hutton v. Apfel, 175 F.3d 651, 654-655 (8th Cir. 1999) (holding ALJ's rejection of claimant's application supported by substantial evidence where daily activities– making breakfast, washing dishes and clothes, visiting friends, watching television and driving-were inconsistent with claim of total disability).

As for Plaintiff's alleged disabling COPD, the ALJ found that while Plaintiff had been diagnosed with COPD, the medical evidence failed to show Plaintiff suffered significant problems during the relevant time period. The Court would also point out that Plaintiff's medical providers repeatedly recommended that Plaintiff stop smoking and despite these recommendations, Plaintiff continued to smoke throughout the relevant time period. See Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir.1997) (noting that a failure to follow prescribed treatment may be grounds for denying an application for benefits). This is not a case in which the correlation between Plaintiff's smoking and Plaintiff's impairment is not readily apparent. Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (citations omitted). To the contrary, there is no dispute that smoking has a direct impact on Plaintiff's pulmonary impairments.

With respect to Plaintiff's alleged back impairment, the ALJ noted that Plaintiff underwent a MRI of the lumbar spine that revealed mild degenerative disc disease. However, the ALJ found, and the records support, that Plaintiff did not seek treatment for severe back problems during the relevant time period. Thus, while Plaintiff may indeed experience some degree of pain due to her back impairment, the Court finds substantial evidence of record supporting the ALJ's finding that Plaintiff did not have a disabling back impairment prior to the expiration of her insured status. See Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997)

(upholding ALJ's determination that claimant was not disabled even though she had in fact sustained a back injury and suffered some degree of pain).

With respect to Plaintiff's alleged mental impairments, the record fails to establish that Plaintiff sought on-going and consistent treatment from a mental health provider. See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against plaintiff's claim of disability). A review of the record also revealed that Plaintiff denied experiencing anxiety and depression on many occasions.

With respect to Plaintiff's vaginal pain, the ALJ acknowledged that Plaintiff had significant problems related to her mesh implant and later removal. The record revealed that in September of 2012, Plaintiff was discharged from pelvic floor physical therapy as she had met her long term goals of decreasing her pain by ninety percent, increasing range of motion and did not need pain medication with intercourse. While Plaintiff complained of some continued pain and sought to have the remaining mesh removed, in May of 2013, after examining Plaintiff, Dr. Landers noted Plaintiff's abdomen was nontender, her range of motion was intact, and Plaintiff had no deficits in motor strength or gait/station. The record indicates that Plaintiff underwent the mesh removal in September of 2013, after which her surgeon limited her to lifting no more than twenty pounds for two weeks. (Doc. 7, p. 385). After reviewing the entire record, the Court finds substantial evidence supports the ALJ's determination that Plaintiff's vaginal pain was not disabling prior to the expiration of her insured status.

Therefore, although it is clear that Plaintiff suffered with some degree of limitation, she did not establish that she was unable to engage in any gainful activity during the relevant time

14

period. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible for the time period in question.

### D. The ALJ's RFC Determination and Medical Opinions:[2]

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id. A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000). However, "an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (citations omitted).

---

[2] The Court will address Plaintiff's third and fourth argument together.

In finding Plaintiff able to perform sedentary work with limitations prior to the expiration of her insured status, the ALJ considered Plaintiff's subjective complaints, the medical records, and the evaluations of the non-examining medical examiners. In determining Plaintiff could perform sedentary work with limitations prior to the expiration of her insured status, the ALJ specifically discussed the relevant medical records, and the medical opinions of treating, examining and non-examining medical professionals, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

With regard to the Attending Physician's Statement (Statement) completed by Dr. Landers, Plaintiff argues that the ALJ did not give this opinion proper weight. In May of 2014, Dr. Landers completed the Statement reporting that he had been seeing Plaintiff since July of 2010, for a diagnosis of persistent pelvic pain from pelvic mesh. (Doc. 7, pp. 600-603). Dr. Landers opined that Plaintiff's condition was severe enough to interfere with attention, concentration, and her ability to tolerate work stress. Dr. Landers indicated that Plaintiff would need to take unscheduled breaks, and might need to lie down to rest at unpredictable intervals during the day. Dr. Landers limited Plaintiff to lifting/carrying five pounds or less; occasional climbing and reaching above; occasional exposure to dust, fumes, and gases; no bending, squatting, crawling, stooping, crouching, or kneeling; and no use of the feet for repetitive movement, as in operating foot controls. Dr. Landers indicated that Plaintiff's ability to sit, stand, and walk "varies."

16

The ALJ gave Dr. Landers opinion significant weight so far as it was consistent with the determined RFC. After reviewing the record, the Court finds substantial evidence supports the ALJ determination that some of the limitations set forth in Dr. Landers statement appeared to be more severe than warranted by the objective evidence of record. As noted by the ALJ, a review of Dr. Landers' treatment notes failed to support the limitations set forth in the Statement. Perkins v. Astrue, 648 F.3d 892, 899 (8th Cir. 2011) (it is permissible for ALJ to discount opinion that is inconsistent with physician's own treatment notes). For example, during the time period in question, Plaintiff saw Dr. Landers on March 22, 2011, September 13, 2011, November 17, 2011, January 30, 2013, and May 10, 2013. There was no mention of vaginal pain until November 17, 2011. At that time, an examination revealed tenderness in Plaintiff's triceps and right metatarsals. In January and May of 2013, examinations of Plaintiff revealed a nontender abdomen, an intact range of motion, and no deficits in motor strength or gait/station. It is noteworthy that in September of 2013, after the expiration of Plaintiff's insured status, her surgeon placed a twenty pound lifting restriction on Plaintiff after her surgery. (Doc. 7, p. 385). After reviewing the entire transcript, the Court finds substantial evidence supporting the ALJ's RFC determination for the time period in question.

### E.     Past Relevant Work:

Plaintiff has the initial burden of proving that she suffers from a medically determinable impairment which precludes the performance of past work. Kirby v. Sullivan, 923 F.2d 1323, 1326 (8th Cir. 1991). Only after the claimant establishes that a disability precludes the performance of past relevant work will the burden shift to the Commissioner to prove that the claimant can perform other work. Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir. 1993).

> According to the Commissioner's interpretation of past relevant work, a claimant will not be found to be disabled if she retains the RFC to perform:
>
>> 1.  The actual functional demands and job duties of a particular past relevant job; *or*
>>
>> 2.  The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

20 C.F.R. §§ 404.1520(e); S.S.R. 82-61 (1982); Martin v. Sullivan, 901 F.2d 650, 653 (8th Cir. 1990) (expressly approving the two part test from S.S.R. 82-61).

The Court notes in this case the ALJ relied upon the testimony of a vocational expert, who after listening to the ALJ's proposed hypothetical question which included the limitations addressed in the RFC determination discussed above, testified that the hypothetical individual would have been able to perform Plaintiff's past relevant work prior to the expiration of her insured status. See Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("The testimony of a vocational expert is relevant at steps four and five of the Commissioner's sequential analysis, when the question becomes whether a claimant with a severe impairment has the residual functional capacity to do past relevant work or other work") (citations omitted).  With the help of the vocational expert, the ALJ found that Plaintiff could also perform other work as a travel clerk prior to the expiration of her insured status. Accordingly, the Court finds substantial evidence to support the ALJ's finding that prior to her date last insured, Plaintiff could perform her past relevant work as a bookkeeper as actually and generally performed, as well as, other work as a travel clerk.

**V.     Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 25th day of October, 2016.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE